37 N.J. Super. 52 (1955)
116 A.2d 793
LAURETTE B. FRIEDMAN, PLAINTIFF-APPELLANT,
v.
ABRAHAM R. FRIEDMAN, ALSO KNOWN AS RUSSELL FRIEDMAN, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 19, 1955.
Decided September 23, 1955.
*54 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. John VR. Strong argued the cause for appellant (Messrs. Strong & Strong, attorneys; Mr. David H. Isacson, of the New York Bar, associate counsel).
Mr. Joseph J. Mutnick argued the cause for respondent (Mr. George G. Mutnick on the brief).
*55 The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff appeals from a judgment of the Chancery Division dismissing her complaint for separate maintenance and awarding defendant a divorce on the ground of extreme cruelty on his counterclaim.
The complaint was in three counts: (1) for separate maintenance on the ground of abandonment and failure to support; (2) for separate maintenance on the same grounds, with the additional vaguely worded charge that defendant had "frequently committed adultery with a person or persons unknown to plaintiff for several months past"; and (3) to recover $1,800 which plaintiff claimed she had had to pay for necessities because of the defendant's failure to support her, the source of the money being $2,000 allegedly inherited from her mother. Defendant generally denied the allegations of the complaint and set up by way of separate defense that plaintiff had been guilty of extreme cruelty toward him from August 1, 1949 to July 6, 1953, when he was physically forced out of the marital apartment. Defendant also counterclaimed for annulment on the ground of fraud on the marriage (this ground is not seriously pressed) and for divorce on the ground of extreme cruelty.
The action was sharply contested, the hearing taking five trial days. In mid-hearing plaintiff, through her attorney, announced that she would not press the second count charging adultery, for lack of direct proof, and subsequently this count was formally abandoned. The attorney stated at the trial, as he does on this appeal, that it was not his intention to prove adultery, and if adultery were shown "it was merely as an adjunct of the abandonment."
It is not clear from the record whether the count seeking recovery of $1,800 was dismissed. At any rate, the notice of appeal is limited to the dismissal of "the complaint for separate maintenance." We are in complete accord with the conclusion reached by the trial court that the proof offered by plaintiff on the third count altogether failed to support her claim.
This leaves for our consideration only the first count of the complaint seeking separate maintenance, and *56 the counterclaim for divorce. It is established law that in an action for separate maintenance brought under the statute, N.J.S. 2A:34-24 (formerly R.S. 2:50-39, as amended) the wife must prove, in addition to the marriage, two other elements  an unjustifiable abandonment or separation by the husband, and his refusal or neglect suitably to provide for her. These two elements must concur. Zehrer v. Zehrer, 5 N.J. 53 (1950); Danzi v. Danzi, 142 N.J. Eq. 662 (E. & A. 1948). On the issue of abandonment, the relation of the parties prior to the separation, the past conduct of the husband, as well as prior separations and prior suits between the parties, are relevant and may characterize the abandonment complained of. Cf. Elliott v. Elliott, 48 N.J. Eq. 231, 235 (Ch. 1891).
The statute requires that the abandonment or separation of the husband shall be "without justifiable cause." The wife's commission of a matrimonial offense affords justifiable cause for the abandonment. Gross v. Gross, 22 N.J. Super. 407 (App. Div. 1952). Nothing short of the commission of such an offense, cognizable as a cause for divorce, will excuse the abandonment. Munger v. Munger, 21 N.J. Super. 49 (Ch. Div. 1952), modified in 24 N.J. Super. 574 (App. Div. 1953). In McNeel v. McNeel, 126 N.J. Eq. 255, 257-258 (E. & A. 1939), it was held that either adultery or extreme cruelty constitute justifiable cause for the husband leaving his wife, but to be available to him in her separate maintenance action, such charge must be pleaded as well as proved. Where a husband seeks to justify his separation on the ground of his wife's alleged extreme cruelty, her conduct must be proved to have been of the same degree and quality as is necessary to warrant a judgment of divorce for extreme cruelty. Dinnebeil v. Dinnebeil, 109 N.J. Eq. 594 (E. & A. 1932); Pfender v. Pfender, 106 N.J. Eq. 373 (Ch. 1930); McLean v. McLean, 104 N.J. Eq. 208 (E. & A. 1929); Cavileer v. Cavileer, 94 N.J. Eq. 160 (E. & A. 1922). The resolution of the single question of extreme cruelty will therefore determine both the complaint and counterclaim.
*57 The opinion filed by the trial judge stresses his opportunity to observe the demeanor of the parties and their witnesses and to judge their credibility. Noting that the principals to the action did not agree as to the facts, he examined the testimony of the supporting witnesses, as well as other elements in the case which he referred to as affording "mute testimony" as to where the truth lay. The judge stated that he was convinced that plaintiff was "not the shrinking, abused person she seeks to impress upon the court"; that her actions and attitudes spoke much louder than her words; that she trifled with the truth and impressed the court as "a woman with an uncontrollable temper who would stop at nothing to attain her end." While recognizing that charges of extreme cruelty made by a husband against his wife are not easy of proof, and require close examination, the court was of the confirmed opinion that defendant had proved his case.
The findings of the court below will not lightly be disturbed on appeal. The trial judge had the distinct advantage of observing the demeanor of the witnesses and a better opportunity to judge of their credibility than a reviewing court. Zehrer v. Zehrer, 5 N.J. 53, 61 (1950). We conclude that the judgment of the Chancery Division must be affirmed.
It may be observed that the counterclaim as well as the testimony dealt with a number of situations and a series of acts starting in 1949 and continuing almost down to the filing of the answer and counterclaim on October 5, 1953. Although the statute, N.J.S. 2A:34-2(c) (formerly R.S. 2:50-2(c), as amended), relating to actions for divorce on the ground of extreme cruelty, provides that no complaint for divorce on this ground shall be filed until after six months from the date of the last act of cruelty complained of  but see in this regard Soos v. Soos, 14 N.J. Misc. 381, 185 A. 386 (Ch. 1936)  the limitation does not apply in the case of a counterclaim, and this by reason of the express language of the act.
*58 Our courts have recognized the risk of inaccuracy involved in attempting to define extreme cruelty. See Smith v. Smith, 40 N.J. Eq. 566, 593 (E. & A. 1885). Generally, extreme cruelty has been defined as that degree of cruelty, either actually inflicted or reasonably inferred, which endangers the life or health of the aggrieved party, or renders his or her life one of such extreme discomfort and wretchedness as to incapacitate him or her, physically or mentally, from discharging the marital duties. Zehrer v. Zehrer, supra; Egnozzi v. Egnozzi, 17 N.J. Super. 433 (App. Div. 1952); MacArthur v. MacArthur, 135 N.J. Eq. 215 (E. & A. 1944); 11 N.J. Practice (Herr, Marriage Divorce and Separation) (1950), sec. 755, p. 138 et seq. It has been said that the courts interfere mainly to prevent future harm rather than to punish the offender for what has already been done. Bonardi v. Bonardi, 113 N.J. Eq. 25 (E. & A. 1933); Fallon v. Fallon, 111 N.J. Eq. 512 (E. & A. 1932). No rigid rule can be laid down to define the extent of injury, actual or apprehended, which will move the court to grant a divorce. Each case must necessarily depend on its own particular circumstances. Yorn v. Yorn, 138 N.J. Eq. 608 (E. & A. 1946). It is now established that personal violence or physical abuse is not the only form of extreme cruelty which will warrant the awarding of a divorce. Germain v. Germain, 20 N.J. Super. 565 (Ch. Div. 1952); Zehrer v. Zehrer, 5 N.J. 53, 58 (1950); cf. Gross v. Gross, 22 N.J. Super. 407 (App. Div. 1952); Dominik v. Dominik, 7 N.J. 198 (1951).
As succinctly stated by Herr, op. cit., sec. 755, p. 141:
"The inquiry to be made in each case in order to ascertain whether there has been extreme cruelty seems to be three-fold: (1) what were the acts and conduct of the defendant (2) what purpose, actual or imputed, motivated the defendant (3) what effect did the acts have, or will they have if continued, upon the health and life of the plaintiff?"
Giving full consideration to the principles set out above, we conclude, as did the trial court, that defendant *59 sustained his counterclaim for divorce on the ground of extreme cruelty. Plaintiff would narrow our attention to three instances of cruelty mentioned in the opinion of the trial judge. These obviously were referred to by way of illustration; they by no means exhaust the category of the many situations and acts testified to which clearly establish extreme cruelty on the part of plaintiff. We do not have here, as in some cases, a few isolated instances of offending conduct. There were acts and threats of violence, and verbal abuse of a humiliating and degrading nature, in the period from 1951 to the summer of 1953. Some of the acts involved actual physical assault resulting in injuries. On one occasion in September 1952  a month featured by several acts of violence  plaintiff pointed a gun at defendant and threatened to shoot him. Like other incidents, this one too was corroborated. Plaintiff produced but slight testimony in contradiction, and what is most significant, failed to take the witness stand to offer even a categorical denial of the marital misconduct with which she was charged. Instead, throughout the trial as well as on this appeal, she has sought to avoid the real issues by maligning the defendant's character through an irresponsible use of innuendo. For example, plaintiff hinted or implied that defendant had been arrested in a vice raid; that he turned informer to the Internal Revenue Bureau; that he fathered a child whose infant picture was presented by plaintiff with the gratuitous suggestion that it "resembles the features of my husband's family"; that he was an adulterer; that he fathered the child of one of defendant's witnesses, and supported the mother and paid for her attorney.
The acts charged to plaintiff were not unintended, and there is nothing to show that they were provoked. To those already mentioned may be added the occasions when plaintiff locked defendant out of the apartment for the night, as in February 1953, an incident which she admitted but sought to explain away. Her mistreatment of defendant was unremitting and reflects such a lack of decent regard *60 for his mental and physical well being as to be inexcusable. Whether one refers her pattern of conduct to the difference in the parties' backgrounds, or to plaintiff's interest in money for its own sake, or to her suspicions of her husband's infidelity (none of them proved), it was such as to undermine both the marriage union and defendant's dignity and mental and physical health.
There can be no doubt, upon even a casual reading of the record, as to the effect of this conduct upon defendant. Both parties were present when counsel argued the appeal, and the differences in their physical make-up, already revealed by the record, became patent. Plaintiff is obviously the stronger, in body and in personality. The testimony was that she was more than 40 pounds heavier than defendant and somewhat taller. He was of slighter build and did not possess a strong constitution. During the marriage he suffered and was treated for war-connected disability, which included nervousness. The physical effects upon defendant of his wife's conduct were of a cumulative nature, so that at the time of separation in July 1953 his mental and physical condition were at low ebb. Several of the witnesses described his appearance after some of his experiences at the hands of his wife  upset, dazed, extremely nervous, afraid. The doctor who testified in defendant's behalf stated that his patient had lost ten pounds between November 1952 to October 1953, and his blood pressure in April 1953 was abnormally low. Defendant's sister testified that at the time of separation defendant was "frightening to look at," thin and haggard looking. His health has improved considerably since July 1953.
Although we place great reliance upon the opportunity of the trial judge to observe plaintiff on the witness stand and judge her credibility, we are not without positive evidence in the record itself in reaching the conclusion that she was not a witness to be believed. For example, she claimed that she inherited $2,000 from her mother's estate, but on the witness stand this sum dwindled to $500. She could not explain the difference in the ages given in the *61 marriage certificate to which she swore and in the passport issued to her by the Canadian Government. Her testimony that she had been left practically destitute by defendant in July 1953, and that he had given her only five single dollar bills, was demolished on cross-examination when she admitted drawing checks on a joint account, revealed that she owned some $4,000 in public utility stocks, and admitted having purchased a foreign sports car with her own money in April 1953 which she traded in for a more expensive American car in November 1953. Although she denied having written a certain postcard to defendant in the course of the trial, a handwriting expert definitely established that the card was in her own handwriting. This expert also established that a pencil copy of the contents of a certain letter to defendant's sister which had been taken from the latter's mailbox, was in plaintiff's handwriting  writing which plaintiff on cross-examination said she couldn't recall and didn't recognize as her own. Again, she was shown a letter, dated in September 1949 and which she had kept under lock and key until May 1953, which she admitted having received and which was signed by one "Alex." (It was in September 1949 that defendant claims he traced his wife to a New York hotel and found her occupying a room which gave evidence of male occupancy.) The missive may be properly described as a highly amorous account of a weekend. Plaintiff's only answer to this confrontation was that she "did not understand why he would write that to me."
We are aware of the fact that there were discrepancies in the testimony of defendant himself in certain particulars, none of them relating to the alleged extreme cruelty, and that the corroborative proof which came from his sister may have been exaggerated. Nevertheless, we are of the opinion that the credible proofs, on balance, substantially support the conclusions of the trial judge that plaintiff's conduct amounted to extreme cruelty within our cases.
The judgment of the Chancery Division is affirmed.